I will do so. Thank you. I'd like to reserve approximately three minutes for rebuttal. Good morning, Your Honors. My name is Robert Crowe. I represent the appellate, Nicholas Tehin, in this matter. I'd like to begin by drawing the Court's attention to a quite recent decision by the Tenth Circuit Court of Appeals that bears directly on my main argument here. And the my main argument primarily regarding the mail fraud counts is that pursuant to the Supreme Court's decision, United States v. Parr, mailings that are both legally compelled and contain no false statements cannot serve as a predicate for a mail fraud offense. The recent case to which I refer is United States v. Lake and Wittig, which was decided on January 5th, 2007. Significantly, that's after all the briefing in this matter was completed. The citation for this case is 472, Fed 3rd, 247. And again, it's a Tenth Circuit decision. The gravamen of this case directly supports my central contention regarding the mail – regarding two of the six mail fraud convictions here, which is that mailings that are legally compelled and contain no false statements cannot support a mail or wire fraud conviction. There, the Court was dealing with wire fraud convictions, but also noted that the two statutes are so similar that their interpretation of one is integral to the interpretation of the other. The Tenth Circuit's opinion in Lake repeatedly cites the U.S. Supreme Court's decision in the Parr case, which I cite in our brief, and also indicates, and I quote from the issue, have an interpreted par to hold the mailings of documents which are required by law to be mailed and which are not themselves false and fraudulent cannot be regarded as mail for the purposes of executing a fraudulent scheme. The citation to that particular quotation is 472, Fed 3rd, at page 256. On that same page, the Tenth Circuit proceeds to catalog an impressive array of decisions from other circuits reaching that exact same conclusion, and it cites decisions from the Third Circuit, the Fifth Circuit, and the Sixth Circuit in support of my central proposition on the mail fraud counts, that mailings which are both legally compelled and contain no false statements cannot support a mail fraud conviction. Now, looking at the particular mailings that are the basis of the six mail fraud counts here of which Mr. Keene were convicted, they're set forth clearly at our excerpts of record, page 9, and in here, there are four of these six that indisputably were legally compelled mailings and indisputably contained no false statements. As to count one, the mailing referred to was a letter from opposing counsel forwarding a settlement check to Mr. Taheen regarding a case called Vintage Ranch. Mr. Taheen didn't cause the letter to be mailed. It was not important to him whether the funds were transmitted via mail, wire. Everybody here in any part of this case is in the Bay Area. They could have been picked up by courier, as was done on a number of occasions here. So the mailing by a third person, not under Appellant's control, who a mailing contains no false statements, by opposing counsel, who had no idea that any scheme was going on, it cannot provide the basis for a mail fraud conviction. So the mailing count one is legally insufficient. The mailing count three is similar. It's also a letter from opposing counsel. Appellant had no control over it, and it concerns the forwarding of another settlement check. There's nothing false in it. And, again, the mail – the use of the mail here was not integral to, you know, his scheme to defraud insofar as the funds could have been wire transferred to his account, they could have been picked up by courier. He had no control over the particular communication or the manner in which the funds were transmitted. And the same is true of the mailings alleged in accounts four and six. The government, you know, I acknowledge wrote a – I thought an excellent brief. And as I stand before you today, I would acknowledge that the mailings that are the subjects of counts two and five, I believe, arguably do contain false statements. So my argument is limited to the mailings in counts one, three, four, and six. Now, the cases the government cites to the – allegedly to the contrary are this in Lucardi and Kellogg cases. And those cases are distinguishable because my argument is, as supported by the Tenth Circus Recent Decision Lake and by United States v. Parr, is that if two conditions are satisfied, and those are mailings were legally compelled and contained no false statements, there cannot be a predicate for mail fraud. However, the mailings at issue in both Lucardi and Kellogg both contain false statements. So those cases are, in fact, distinguishable from the mailings that are alleged as the basis of the mail fraud counts in counts one, three, four, and six. Consequently, the convictions for those counts, one, three, four, and six, must be Now, regarding the money laundering transactions, the – Mr. King was convicted of two different types of money launderings. Counts 7 through 11 allege the promotion of an unlawful scheme by means of certain monetary transactions. And I have two arguments to make regarding counts 7 and 11. First of all, counts 7 and 11 all involve payments of settlement funds to clients. There's nothing illegal about that. In fact, Mr. Tahin is a lawyer, and all of us here are lawyers. You know, we know we have an ethical duty to pursue our clients' cases and their best interests, and in his case, as he was a personal injury lawyer, to resolve those cases and then to transmit the proceeds of those settlements to the clients. And here, in counts 7 through 11, each one of those transactions are the payment of settlement funds to the clients. Those were legally compelled. There's nothing else Mr. Tahin could have done at that point. So as an extension of our argument on the mail fraud counts, under par, a legally compelled act, in this case the payment of settlement funds to the clients, cannot provide the basis for money laundering convictions. And I have another case to cite in the Court, which is, you know, another elaboration on this same theme. And that's the Fifth Circuit's decision in United States v. Brown. The citation for that case is 186, Fed 3rd, 661. There, that matter concerned a car dealership that was operated for a long time and was very legitimate, with the exception they nickel and dime the clients, you know, out of some fees they were entitled to. For example, they charge excessive title and registration fees for these cars and things like that. And what the Fifth Circuit ruled in that case, and, you know, by the way, the transactions at issue there were paying regular business expenses like rent, paying fees for disposal of waste products like oil. What the Fifth Circuit held there is when you have a primarily legitimate business and the business makes payments for routine business expenses that do not promote the illicit part of the business, those cannot support a money laundering conviction. And that's really what we have here. Mr. Taheen, there's no dispute about this, he operated a prominent, successful plaintiff's personal injury practice in San Francisco for 20 years. He handled many, many cases, and he handled many cases during the time of this alleged scheme, but, you know, regrettably, on seven of those cases, he did use the funds from Client B to pay Client A, the funds from Client C to pay Client B. That happened. But, you know, as part of his business, the most legitimate disbursement of funds he could possibly do was to repay clients' settlements. And that's what Counts 711 are. So those counts cannot support a money laundering conviction for promoting an unlawful activity. In addition, now I'd like to address Counts 12 through 15, which are also money laundering charges, but of a slightly different type, which is engaging in financial transactions with criminally derived proceeds. And the primary point I would like to make here is this. The predicate, the specified unlawful activity for those money laundering charges are the mail fraud allegations in Counts 1 through 6. Now, when one looks at the mailings, as specifically alleged, this is on page 9 of our excerpts of record. If you agree with me that the mailings in Counts 1, 3, 4, and 6 do not contain any false statements, they cannot be a predicate for mail fraud. Therefore, there are only two of the remaining mailings that could possibly be predicates for mail fraud. And those are, let's see, it's Count 2 and Count 6. Now, of those two mailings, this is a really significant point that I'd like to emphasize. The earliest of those two mailings occurred on January 31st of 2002. And as a mailing is an integral part of mail fraud, the earliest the mail fraud could have begun is with that mailing on January 31st of 2002. But if we look at the financial transactions alleged in Counts 12 through 15, three of those four occurred prior to January 31st of 2002. In fact, the transactions alleged in Counts 12, 13, and 14 all occurred in 2001. So if the first mailing that could possibly be a predicate for mail fraud occurred in 2002, there couldn't be a mail fraud before 2002. And therefore, the money laundering counts in 12, 13, and 14 must fail also because there is no predicate offense. So that leaves us only with Count 15 of the money laundering charges. And, you know, as to that, that occurred in 2002. And, you know, I would do not make any argument that was a legitimate transaction. That was not. So I'm not here to defend that, but I am here to ask the Court to reverse the convictions on Counts 7 through 11 and 12 through 14. Now, I'd like to quickly address some sentencing issues here. And these are very important. In our post-Booker days, one might say, why is the Court's calculation of guidelines important? And the answer is twofold. Primarily, as this Court stated in United States v. Merriweather, a defendant, even though the guidelines were advisory, is entitled to have the Court start from the correct guideline range in considering the sentence. And here, that didn't happen, and it was very much to Mr. Taheen's detriment. The Court started the offense level 34, for which the sentencing range is 151 to 188 months, and sentenced Mr. Taheen, who is 61 years old now, to 170 months. That's a big sentence, especially when one considers, if you look at the amended judgment, that the restitution amount ordered was under $500,000. So for an actual loss of $500,000, he gets 170 months? That's huge. Now, there are two particular errors in sentencing I'd like to draw the Court's attention to. The biggest one is regarding the number of victims. That issue was specifically submitted to the jury, and the jury ruled that the number of victims was less than 10. And then the trial court, sua sponte, found the number of victims more than 50. That's a four-point increase. That's a big deal here. Counsel, what was the error in that? The reason it was submitted to the jury was because of the confusion regarding the extent to which a judge can make findings of fact in conjunction with sentencing. But post Booker, what was wrong with the judge making that determination? It was not bound by the jury's verdict. You're correct on that. The government makes that point, and I concede that point. The judge was not bound by the verdict. But here's where the error lies. In determining the amount of loss under Guideline Section 2B1.1b1, it is relevant to consider the date the loss was detected. And so in connection with the amount of loss, all of the first case where the client's funds were misapplied was this Vintage Ranch case. Every single one of the clients in that case were repaid. That case was very unusual for Mr. Keene's practice as far as it was a class action. Counsel, that has nothing to do with whether or not there was actually fraud. The fact that the victims were ultimately repaid does not negate finding a fraud. It does not negate finding a fraud, but it is relevant in terms of determining the number of victims. The date of detection is relevant to determining the total amount of loss. But the Guideline specifically defined a victim as a person who suffers an actual loss, and that's in Application Note 1 to Section 2B1.1. The fact that you're repaid doesn't mean that you didn't suffer a loss in the first instance. Well, the Application Note 1 uses the term a party who sustained an actual loss. And here, because they were repaid, there was no actual loss. And that's how victims are defined in Application Note 1. And what the Court did – yes, Your Honor. Well, that was never argued. The Court did not explain its decision that way. And I believe there is a distinction in how victims are identified for purposes of determining the amount of loss versus the number of victims. And here, the – I also would point out the pre-sentence report specifically states that, but for the Vintage Ranch case, there were six victims. So the pre-sentence report was looking at determining the number of victims by virtue of the number of cases that were involved. And here it was purely fortuitous that the Vintage Ranch case involved a lot of people, and they were all repaid, and therefore no restitution was ordered as to them. That's the chance you take when you defraud a class. Well, I think the chance he took is that the amount would be, when the loss was detected, he would not get credit for the repayments post-detection. I think that's a correct ruling, and I'm not here to argue that. But I think if you look at Application Note 1, it does specifically define victims as those who suffered an actual loss. And at the end of the day, they didn't. What case authority are you relying upon to support your argument? I think it's clear from the plain language of Application Note 1 itself. So is there any case that has interpreted that application note in the way that you are? I don't have a citation to present. If the Court would like, I'd be happy to submit a supplemental letter brief on that issue on that page. The other sentencing I'd like to address very briefly is the enhancement for obstruction of justice. Here, the sequence of events is the State Bar does an investigation. Mr. Taheen winds up giving up and saying, mea culpa, he consents to, you know, a disbarment. At that point, what the State Bar does is they take over his law practice. They search jurisdiction over his law practice. In connection with that, Mr. Taheen produces all of his files to the State Bar. And as part of the production of all of his files goes the Nancy Ferry file. And as part of that file, there's a document wherein certain expenses were charged to Ms. Ferry, which, in fact, were not incurred in connection with that case. So that document just goes to the State Bar with everything else. But at this point, the State Bar isn't investigating him. That's done because he's already accepted the maximum sanction the State Bar can impose, which is disbarment. So there is no investigation at that point. So there his production of that piece of paper in this context did not obstruct the State Bar's investigation, and the two-point enhancement should not have been imposed. And in conclusion, before my brief rebuttal time, I ask that the Court reverse the mail fraud convictions in counts 1, 3, 4, and 6, and the money laundering convictions in counts 7 through 11 and 12 through 14, and remand the matter to Shakur Court with instructions that it should not apply the four-level enhancement or any enhancement, for that matter, for number of victims nor the obstruction of justice enhancement. Thank you. Very good. Thank you, Your Honor. May it please the Court. I'm Amber Rosen representing the United States in this matter. I'd like to address three issues. First, the claim of insufficiency. Secondly, the number of victims. And finally, the obstruction of justice enhancement. Regarding defendants' claim that the mail fraud counts were legally insufficient because the mailings were legally compelled, I think this circuit has put that issue to rest in both Licardi and Kellogg, where it's specifically held that legally compelled mailings are not a legally compelled mail fraud. Moreover, the Supreme Court held in Schmuck that the mailings can be innocent, they can be routine, they can even be counterproductive to the scheme and still support a mail fraud scheme. So I think it really at this point doesn't matter what the Tenth Circuit has said about that. Moreover, I think it's not even clear that these were legally compelled mailings. The defendant asserts that but hasn't really made much argument about that. The mailings in counts 3, 4, and 6 were letters that Mr. Taheen sent to opposing counsel in attempt to obtain settlement funds. That may have been part of his job as a lawyer to try to pursue his client's claims, but there's nothing that would require him to do that via a letter. Moreover, those solicitations were in furtherance of his scheme. At the time that he sent those letters, which count 4 was in December of 2001 and then counts 3 and 6 were in the early part of 2002, defendant was in desperate financial straits. The government put on five different witnesses, and this is in the record between pages 1530 and 1590, all of whom testified that defendant contacted him, contacted them, desperate to obtain short-term high-interest loans, which he did during this time. He called Mr. Neunenmacher on Christmas Eve trying to get a loan of several hundred thousand dollars. He got a loan of $200,000 from Mr. Dang in January of 2002. He got a loan from Mr. Ferguson in February for a couple of hundred thousand dollars. He got another loan from Mr. Reed for $60,000, which he never paid back. He got a loan for $5 million from Thomas Rankin Torrey at a rate of interest payments of $60,000 a month. This shows that he was desperate for money, and in that context, his solicitation of trying to obtain settlement funds to come into his business to use for his own purposes puts that into the context of how they furthered his scheme. And, in fact, he did then quickly misappropriate those funds once they came in. He wasn't diligently pursuing his client's interest by obtaining those settlement funds because none of that money went to the actual clients for whom those payments were made. The McCoy funds went to pay the Vintage Ranch clients. The Abiel funds also went to pay the Vintage Ranch clients. And the Conway settlement funds, $400,000 went to pay his own business expenses, and then $300,000 went to pay other clients. So, yes. Kagan, would you please address – did you try this case in the district court? I did not. Would you please address counsel's argument regarding the victims and the loss that he made regarding the class? Absolutely. First of all, I take it you mean with respect to the guideline interpretation? Yes. One, I just want to make the point that I think he's waived that argument. It wasn't in his opening brief. The only claim made in the opening brief was the Sixth Amendment claim. And I think by not raising it in the opening brief and for the first time on appeal, raising it in the reply brief, it's been waived. But in any event, it should claim on – it should fail on its merits. As counsel pointed out, victim is defined as any person who sustained any part of the actual loss. Actual loss, however, is defined in the application notes as reasonably foreseeable pecuniary harm, which is then defined as monetary loss or monetary harm that defendant knew or should have known was a potential result of the offense. So to be actual loss doesn't need to mean – actual loss can be a potential loss. The person doesn't even need to be out of the money necessarily for purposes of the guidelines. Moreover, the victim ranch monies were, in fact, included in the loss calculation because they didn't get a – he didn't get a credit against that loss. You only get a credit against the loss for purposes of the loss calculation if the fraud was detected after you paid the victims back. But in this case, the district court specifically found, and it was supported by the evidence, that the victim ranch clients weren't paid back until, I think, beginning in March through July of 2002. But the fraud was detected in January of 2002 when Roy Cherness of Legal Aid determined that the – that there wasn't enough money to pay his clients back. So in any event, the victim ranch loss was included in the loss calculation. So even under defendant's interpretation, the victim ranch client should have been counted as victims because they did sustain part of the actual loss. But I think this Court's interpretation of victim and loss, the fact that they, just as a common sense matter, did sustain a loss because they went for months without getting those settlement monies, is correct. And there is an Eleventh Circuit case specifically holding that, and that's United States versus Lee. Roberts. I think Judge Schools has a question. Oh, yes. I'm sorry. The vintage ranch, did he pay if he did not receive other settlements? I don't believe they could have, no. He had spent their money soon after he received those settlement funds. So, no, I don't believe that he could have. But the Lee case, which is at 427F3 88-1, specifically says that even where clients are reimbursed later, they can still be victims for purposes of the guidelines. And in part that makes sense. If you think about it, given that the loss calculation – I'm sorry. Given that loss would not – you can be sentenced based on intended or potential loss, why would we treat victims who were maybe only intended victims better than those who actually sustained loss but were repaid later? I hope that answers your question, Judge Rawlinson. I'd like to move on to the obstruction of justice enhancement, if I may. Defendant's characterization of the timing of the bar investigation simply doesn't square with the record. First of all, it's clear that the bogus expert witness fee claims that defendant provided to the bar were in response to the bar's inquiry. Ms. De La Rosa specifically testified to that, and that's in the supplemental excerpts of record at pages 107 through 109. She said the bar was questioning the expert fees in the Nancy Ferry case. Defendant asked her to make an accounting of that when she told him that she told her to create these bogus documents to give to the bar, and that he had been meeting with the bar investigators during this time. Moreover, the party stipulated – and this is at the excerpts of record at page 113, the supplemental excerpts – that the documents were turned over, quote, following a request from the state bar for the defendant's billing file in the Nancy Ferry case. And finally, defendant's claim in the reply brief that when he withdrew his opposition to the state bar's petition to place him on involuntary inactive status that he was therefore disbarred and the investigation was over is not correct. Even after he was declared inactive, the bar then filed notice of disciplinary proceedings because they still needed to formally disbar him. And he was contesting that disbarment at least up until October of 2002, the record shows. And the parties even stipulated at the record at page 1883 that the application for the active, the involuntary inactive enrollment status merely sought, quote, temporarily to bar the defendant from practicing law pending full disciplinary proceedings. So there was still ongoing bar investigation at the time that he gave over those false billing statements. And I would ask that the Court affirm the convictions and the sentence. Thank you. I will submit it as argued. Thank you very much, Your Honors. Thank you both. The case is well argued and we shall submit it. The Court will now take a break for about 15 minutes.
judges: Gould, Rawlinson, Covello